# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

| | |
|---|---|
| SHARON BURNEY and CHASTITY MCNEIL, *on behalf of themselves and all individuals similarly situated*, | Case No. _____ |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **TRIAL BY JURY DEMANDED** |
| MARK CURRY and SENTINEL RESOURCES, LLC, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiffs Sharon Burney and Chastity McNeil ("Plaintiffs"), *on behalf of themselves and all individuals similarly situated*, by and through Counsel, and for their Class Action Complaint against Mark Curry and Sentinel Resources, LLC, ("Defendants"), allege as follows:

### INTRODUCTION

1.      This case involves a rent-a-tribe enterprise that was established to evade state usury laws. Defendants Mark Curry and Sentinel Resources operated and participated in the alleged enterprise revolving around Great Plains Lending, LLC ("Great Plains").

2.      Consistent with the rent-a-tribe model, the enterprise facilitated the making and collection of high-interest loans in the name of Great Plains—an entity formed under Otoe-Missouria tribal law to ostensibly shield the scheme through dubious claims of sovereign immunity. Although Great Plains was held out as the "lender" of the internet loans, the Otoe-Missouria Tribe had minimal involvement in the operations and received a mere 6% of the revenue from the loans. By contrast, non-tribal companies, such as Think Finance, provided the infrastructure to market, fund, and collect the loans.

3.      Over the past seven years, Defendants played an integral role in the operation and management of the enterprise at issue, including by establishing and managing the relationship between the Otoe-Missouria Tribe and Think Finance. For example, this is evidenced by an agreement between Think Finance, Great Plains, and Sentinel Resources, in which Defendants agreed to be the "exclusive provider of guidance and authority in business dealings between" Think Finance and Great Plains. (Ex. 1.) To that end, Defendants were "responsible for communications" between the Otoe-Missouria Tribe and Think Finance "on all matters pertinent to the business relationship." The agreement further required Think Finance to review any changes or modifications to Great Plains' "structure or operating policies" and to receive "specific written permission" from Defendants before implementation of the changes and modifications. In return for their services, Defendants received 4% of the net revenue generated from the illegal enterprise.

4.      Based on Defendants' conduct, Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. Defendants received millions of dollars derived from the collection of unlawful debt. Defendants actively participated in the scheme and conspired with each other and others to repeatedly violate state lending statutes resulting in the collection of unlawful debt from Plaintiffs and Class Members. Defendants' acts described herein are unlawful as set forth in 18 U.S.C. § 1962(c)–(d).

5.      Plaintiffs also assert a class claim for violations of Florida's usury laws. Because Plaintiffs' loans were issued by an unlicensed lender and exceed 18% annual percentage rate ("APR"), such loans are null and void and neither the lender nor any third party may collect, obtain, or receive any principal, interest, or charges on the loans. FLA. STAT. §§ 516.01(2), 516.02. Accordingly, Plaintiffs and the class members seek to disgorge all amounts paid by Florida consumers on any Great Plains loans, as well as twice the amount of any interest paid in excess of

18% by Florida Consumers, punitive damages, and their attorneys' fees and costs. FLA. STAT. §§ 687.04, 687.147.

6.      Plaintiffs further assert class claims for Defendants' violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). FLA. STAT. 501.201–213. Defendants engaged in unfair and deceptive conduct by, among other things, lending money at interest rates that are usurious under Florida law, representing to consumers like Plaintiffs that their loans were valid and enforceable when they were not, representing to consumers like Plaintiffs that their loans were governed by tribal law and therefore not subject to Florida's usury limits when they were not, and collecting from consumers money that Defendants knew was not pursuant to a valid, enforceable debt. Plaintiffs are therefore entitled to their reasonable attorneys' fees, costs, and injunctive relief for Defendants' FDUPTA violations. FLA. STAT. §§ 501.204, 501.2105, 501.211.

## JURISDICTION

7.      This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as Plaintiff Burney is a resident of this District and Division, Plaintiff McNeil is a Florida resident, and a substantial part of Plaintiffs' claims occurred in Florida.

## PARTIES

9.      Plaintiff Chastity McNeil ("McNeil") is a natural person and resident of this Division and District.

10.     Plaintiff Sharon Burney ("Burney") is a natural person and resident of Florida.

11.     Defendant Mark Curry ("Curry") is a natural person and resident of Puerto Rico. Curry was the founder and chief executive officer of Sentinel Resources, which Curry created to

make and collect the usurious loans described herein. As explained below, Curry operated and participated in the affairs of the rent-a-tribe lending scheme and had direct personal involvement in the creation and day-to-day operations of the illegal enterprise.

12.     Defendant Sentinel Resources, LLC ("Sentinel Resources") is a Delaware limited liability company founded by Curry and Brian McGowan. Sentinel Resources operated and participated in the affairs of the enterprise.

## FACTUAL BACKGROUND

A.     **Florida law prohibits usury and provides for strict licensing requirements to protect consumers from predatory and abusive lending practices.**

13.     Like many other states, Florida has enacted usury laws that prohibit lenders from making high interest loans. Indeed, prior to even becoming a member of the Union in 1845, the Florida legislature passed laws prohibiting usury as early as 1822.[1] As the Florida Supreme Court noted, "The very purpose of statutes prohibiting usury is to bind the power of creditors over necessitous debtors and prevent them from extorting harsh and undue terms in the making of loans." *Chandler v. Kendrick*, 108 Fla. 450, 452, 146 So. 551, 552 (1933).

14.     Pursuant to Fla. Stat. § 687.03, interest rates greater than 18% per annum on loans in the amount of $500,000 or less are usurious. Moreover, loans at rates between 25% and 45% per annum constitute criminal usury punishable as a second-degree misdemeanor, Fla. Stat. § 687.071(2), and loans at rates greater than 45% per annum constitute criminal usury punishable as a third-degree felony. Fla. Stat. § 687.071(3). Those who violate the usury provisions must forfeit "the entire interest so charged, or contracted to be charged" and double the amount of usurious interest paid. Fla. Stat. § 687.04.

---

[1] *See* Jeremiah W. Blydenburgh, A Treatise On The Law Of Usury; To Which Are Added, The Statutes Of Several States Relating To Interest Now In Force, 172 (1844), available online at https://books.google.com/books?id=6Fk9AAAAIAAJ&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onepage&q&f=false.

15.     Additionally, in Florida, lenders must be licensed by the Office of Financial Regulation, and loans of $25,000 or less with interest exceeding 18% per annum are void and unenforceable. Fla. Stat. § 516.02(1-2).

16.     The Florida Attorney General has made clear that payday loans and similar loans are subject to Florida's usury laws. Fla. AGO 2000-26 (Fla. A.G.), 2000 WL 543211.

**B.     The rent-a-tribe model was developed to evade state usury laws, such as Florida's.**

17.     Predatory financial services, including high-cost installment loans and payday debt traps, often involve "high-cost, small dollar loans to low income, low-credit borrowers" and "a repayment system that involves the lender withdrawing funds directly from the borrower's bank account."[2] These types of debt traps "are heavily marketed to financially vulnerable consumers."[3]

18.     Over the past decade, payday lending has become "one of the fastest growing segments of the consumer credit industry," and as of 2005 "there were more payday-loan stores in the United States than McDonald's, Burger King, Sears, J.C. Penney, and Target stores combined." Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders & Tribes: Are Both Tribal Sovereignty & Consumer Protection at Risk?* 69 WASH. & LEE L. REV. 751, 759 (2012). (quoting Karen E. Francis, Note, *Rollover, Rollover: A Behavioral Law & Economics Analysis of the Payday Loan Industry*, 88 TEX. L. REV. 611, 611–12 (2010)).

---

[2] *See Payday, Vehicle Title, & Certain High-Cost Installment Loans*, 131 HARV. L. REV. 1852, 1852 (2018).

[3] *See CFPB Finalizes Rule To Stop Payday Debt Traps*, CFPB (Oct. 5, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-finalizes-rule-stop-payday-debt-traps/. "A debt trap results when a borrower is repeatedly unable to repay a loan and must reborrow, paying additional fees each time." *See Payday, Vehicle Title, and Certain High-Cost Installment Loans*, *supra* n.2, at 1853.

19.     It is no secret that "internet payday lenders have a weak history of complying with state laws." *Id.* at 764. Prior to the rent-a-tribe business model, some payday lenders entered into partnerships with national banks to avoid compliance with state laws.[4]

20.     Beginning in 2005, federal regulators began cracking down on rent-a-bank arrangements, and they were nearly eliminated by 2010—largely by the assessment of penalties and fines against participating banks. *See, e.g.*, Creola Johnson, *America's First Consumer Financial Watchdog Is on A Leash: Can the CFPB Use Its Authority to Declare Payday-Loan Practices Unfair, Abusive, and Deceptive?*, 61 CATH. U. L. REV. 381, 399 n.16 (2012).

21.     In response to the crackdown on rent-a-bank arrangement, several payday lenders reincarnated the lending model through associations with Native American tribes to avoid state laws. *Id.*; *see also* Martin & Schwartz, *supra* ¶ 18, at 1.

22.     "In these partnerships, online payday lenders register businesses on Native American lands and claim to be exempt from lawsuits and state usury caps under tribal sovereign immunity. Using this doctrine, lenders argue that because their businesses are located on or headquartered within the borders of a Native American reservation, they are bound by the laws of that reservation only, not the laws of the state in which the reservation is located or the state in which the borrower resides." Johnson, *supra* ¶ 20, at 399 (footnotes omitted).

23.     A central feature of the rent-a-tribe business model is the choice-of-law provision used in the scheme's lending agreements. The non-tribal participants in the scheme will claim that they have no liability for their violations of state and federal laws because only tribal law applies

---

[4] *See, e.g.*, Jean Ann Fox & Edmund Mlerzwinkski, *Consumer Fed'n of Am. & U.S. Pub. Interest Research Grp.*, *Rent-a-Bank Payday Lending: How Banks Help Payday Lenders Evade State Consumer Protection* at 17-22 (2001), available at http:// www.consumerfed.org/pdfs/paydayreport.pdf.

to the loans. Such claims have been uniformly denied by courts from a variety of jurisdictions across the country, thus demonstrating the illegality of the rent-a-tribe lending scheme.[5]

## C.      The enterprise adopted the rent-a-tribe scheme to evade state usury laws, such as Florida's.

24.      Prior to the creation of the lending scheme at issue, Think Finance used a rent-a-bank lending model. (*See* Ex. 2.)

25.      Under this arrangement, loans were originated in the name of First Bank of Delaware, but the bank served as nothing more than a nominal lender on behalf of Think Cash, Inc. ("Think Cash"), Think Finance's predecessor. Ex. 2 at TF-PA-504641.

26.      In return for the use of its name, First Bank of Delaware received 10% of the revenue from the loans. Ex. 2 at TF-PA-504640.

27.      By contrast, through its wholly owned subsidiary TC Administrative, Think Cash received the "excess" of the cash flow after accounting for losses, management fees, and fixed rate interest payments to investors, i.e., the third parties who invested money to allow Think Cash to grow the scheme. Ex. 2 at TF-PA-504640.

28.      During an audit of First Bank of Delaware, the Federal Deposit Insurance Corporation scrutinized the relationship between First Bank of Delaware and Think Finance, especially in light of an outstanding cease and desist order directing First Bank of Delaware to terminate its relationship with "all third-party lending programs." *See, e.g., In the Matter of First*

---

[5] *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *7 (C.D. Cal. Aug. 31, 2016); *W. Sky Fin., LLC v. State ex rel. Olens*, 300 Ga. 340, 348 (2016), *reconsideration denied* (Dec. 8, 2016); *Inetianbor v. CashCall, Inc.*, No. 13-60066-CIV, 2015 WL 11438192, at *3 (S.D. Fla. Dec. 8, 2015); *State ex rel. Cooper v. W. Sky Fin.*, LLC, No. 13 CVS 16487, 2015 WL 5091229, at *10 (N.C. Super. Aug. 27, 2015); *MacDonald v. CashCall, Inc*, No. CV 16-2781, 2017 WL 1536427, at *10 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017); *Hayes*, 811 F.3d at 675; *Rideout v. CashCall, Inc.*, No.  2018 WL 1220565, at *8 (D. Nev. Mar. 8, 2018).

*National Bank,* Case No. FDIC-07-256b, Order to Cease and Desist, Order for Restitution, and Order to Pay (Oct. 9, 2008)

29.     As a result of the FDIC's audit, First Bank of Delaware decided to terminate its relationship with Think Finance.

30.     On around August 2010, Think Finance's executives, in collaboration with their primary investor, developed a solution to avoid the banking regulatory issues raised by the FDIC— they adapted their business model to use a tribal entity as a conduit for the loans. The purpose of adopting the rent-a-tribe model was to avoid banking regulatory issues and leverage Think Finance's existing sourcing, underwriting, and servicing platforms from the discredited rent-a-bank model.

31.     Think Finance and their primary investor identified state regulation, including interest rate caps and prohibitions on payday lending to be their primary regulatory concern.

32.     Think Finance decided to model its rent-a-tribe model after CashCall, Inc., which they identified as their main competitor, and Think Finance retained the same legal counsel used by CashCall to construct the tribal lending model, Claudia Callaway.

33.     Instead of using a national bank as a nominal lender, Think Finance would use a business entity organized under the laws of a Native American Tribe as the nominal lender. The entity organized under tribal law would originate installment loans that were substantially similar to the loans originated under the rent-a-bank arrangement.

34.     Within a few days of origination, the loans would be purchased by GPL Servicing, Ltd. ("GPLS"), a limited partnership controlled by Think Finance's primary investor.

35.     GPLS was the special purpose vehicle created to raise the hundreds of millions of dollars in capital for the illegal loans. According to Think Finance, GPLS was created "to allow investors to purchase interests in the consumer loans originated by Native American Tribal lending

businesses." *See Think Fin., LLC*, Case No. 17-03106 (Bankr. Tex.) (Dkt. 1, Compl. ¶ 24) (explaining the creation of GPLS). "GPLS raised money from investors," and these funds were then used to expand the portfolios of Great Plains. (*See, e.g., Think Fin., LLC*, Case No. 17-03106 (Bankr. Tex.) (Dkt. 1, Compl. ¶ 25).

**D.     Curry introduced Think Finance to the Otoe-Missouria Tribe for the purpose of establishing the illegal lending enterprise.**

36.     After receiving notice of the termination of its rent-a-bank arrangement, Think Finance registered the trademark for Great Plains and purchased the URL, www.greatplainslending.com. (*See* Ex. 3 at TF-PA-1682.)

37.     In January 2011, Think Finance began vetting potential tribal partners and identified the Otoe-Missouria Tribe as a potential candidate.

38.     Upon information and belief, Think Finance first reached out to Curry, who had a long history of business relationships with the Tribe, including operating another rent-a-tribe enterprise with the Otoe-Missouria tribe.

39.      Curry introduced Think Finance to the Otoe-Missouria Tribe, and Curry played a central role in establishing and managing the relationship between the Otoe-Missouria Tribe and Think Finance.

40.     On January 12, 2011, Think Finance's representatives met with members of the Otoe-Missouria Tribe to promote the potential venture.

41.     Upon information and belief, Curry arranged and attended the initial meeting between Think Finance and the Otoe-Missouria Tribe.

42.     Prior to this meeting, employees of Think Finance created a PowerPoint presentation entitled "Great Plains Lending Meeting," which contained an agenda of key points to present to the Otoe-Missouria Tribe. (*See* Ex. 3 at TF-PA-1676.)

43.     The agenda of key points included a company overview of Think Finance, an overview of the loan program, the structure of the arrangement, contractual arrangements, operational responsibilities, and next steps. (Ex. 3 at TF-PA-1676.)

44.     Great Plains had not been formed as of this meeting, and, the presentation identified one of the "next steps" as "[c]reate tribal entity—Great Plains Lending, LLC." (Ex. 3 at TF-PA-1686.)

45.     The other steps included setting up a "tribal bank account," "[r]eview/approve consumer legal documents," and "[r]eview/sign contractual agreements." (Ex. 3 at TF-PA-1686.)

46.     In February 2011, Think Finance held another meeting with the Otoe-Missouria Tribe to promote the potential venture. (*See* Ex. 4.)

47.     As part of this process, Think Finance created a PowerPoint entitled "Emergency Cash Lending—A New Source of Tribal Revenue." (Ex. 4 at TF-VA290544.)

48.     The PowerPoint claimed that "[o]nline emergency cash lending" represented "a significant opportunity for increased tribal revenue" and that Think Finance had "a unique turnkey solution for helping tribes enter this lucrative market." (Ex. 4 at TF-VA290545.)

49.     The "[t]urn-key solution include[d] technology, marketing, risk management, compliance support, and access to capital funding," which could be "[u]p and running 90 days from signed contracts." (Ex. 4 at TF-VA290545.)

50.     More specifically, Think Finance touted that it had: (1) a "proven technology platform," that had "millions of transactions processed to date," (2) a "marketing machine" that had "100,000 applications monthly," (3) "best in class underwriting," (4) "access to third party capital," including "up to $150" million for funding the loans, and (5) "extensive compliance experience," including multiple "successful FDIC and state exams." (Ex. 4 at TF-VA290549.)

51.     Think Finance further explained that "[u]sing Think Finance technology and services," would allow tribes to "generate millions of dollars in cash flow with no investment in technology, lending capital, or marketing costs, and with no risk of loss." (Ex. 4 at TF-VA290545.)

52.     The primary sources of this revenue were "[e]mergency cash users—mainstream Americans," who were "65% female," with household income of "$25K-50K" who primarily needed the emergency loans for unexpected bills, medical costs, car repairs, or to avoid overdrafts. (Ex. 4 at TF-VA290547.)

53.     The PowerPoint further claimed that "Recent Rulings Have Confirmed that Tribes Can Provide These Services without State Regulatory Jurisdiction." (Ex. 4 at TF-VA290547.)

54.     On February 24, 2011, the Otoe-Missouria accepted Think Finance's proposal.

**E.      The key contracts and structure of the rent-a-tribe scheme, including the Consulting Agreement with Sentinel Resources.**

55.     After the Otoe-Missouria Tribe accepted Think Finance's proposal, the key parties entered into a series of contracts that established the structure of the lending program, including: (1) a Participation Agreement between GPLS and Great Plains dated May 25, 2011; (2) the Administrative Agency Agreement between GPLS and TC Administrative dated February 28, 2011; and (3) the Consulting Agreement between Great Plains, TC Decision Sciences, and Sentinel Resources dated May 25, 2011.[6]

56.     The Participation Agreement between GPLS and Great Plains established GPLS's right to purchase an "undivided ninety-nine percent (99%) participation interests" in the Great Plains loans, "including any income or profits therefrom and the applicable Loan Documents." (Ex. 5 § 2(a).)

---

[6] At this time, Think Finance's subsidiaries also entered into a marketing and servicing agreement with Great Plains. These agreements provided Think Finance with the authority to handle these material aspects of the loan process.

57.     As a result of the purchase, GPLS was "considered for all purposes as, the legal and equitable owner" of the interest in each loan "and the associated Loan Documents. . . . together with all of the rights, privileges and remedies applicable thereto." (Ex. 5 § 2(c).)

58.     In return for the use of its name on the loans, the Participation Agreement entitled Great Plains to receive a "Service Fee" of 6% to 10% depending on the outstanding balance of the portfolio. (Ex. 5 §§ 1(fff), 2(a).)[7]

59.     Through a separate agreement entitled "Administrative Agency Agreement," GPLS assigned its rights to the income and profits to TC Administrative Services, an employee-less company wholly owned and operated by Think Finance.

60.     The Administrative Agency Agreement designated TC Administrative with certain responsibilities and, in return, TC Administrative received an "Agent Fee," which was defined as "the interest and fees received on the Purchased Loans during such months," as well as the "principal collected in such month on Purchased Loans that were Non-Current Purchased Loans in the prior month." (Ex. 6 at pg 2.)

61.     TC Administrative's fee was reduced by: (1) the 20% "Fixed Return" of the outstanding principal amount loaned by GPLS, and (2) any and all expensed incurred by GPLS, "including, but not limited to, the Revenue Share paid to [Great Plains] for such months" pursuant to the Participation Agreement. (Ex. 6 at pg. 2.)

62.     Finally, pursuant to the Consulting Agreement, Sentinel Resources was designated with control over Great Plains' operations that were not handled by Think Finance. (*See generally* Ex. 1.)

---

[7] As explained below, Sentinel Resources received 40% of Great Plains' service fee.

63.     For example, the consulting agreement provides that Sentinel Resources shall be the "exclusive provider of guidance and authority in business dealings" between Think Finance and Great Plains. (Ex. 1 at GPLV00000750.)

64.     To that end, Sentinel Resources was responsible for communications between Think Finance and Great Plains, and Think Finance was prohibited from directly communicating with Great Plains or the Otoe-Missouria's Chairman. (Ex. 1 at GPLV00000760.)

65.     The agreement further required Think Finance to review any changes or modifications to Great Plains' "structure or operating policies" and to receive "specific written permission" from Sentinel Resources before implementation of the changes and modifications. (Ex. 1 at GPLV00000760.)

66.     Think Finance was also required to review any "legal contact" with Sentinel Resources, as well as "any public communication" regrading Great Plains, such as website communications, media/press releases, and marketing materials "of any kind or appearance." (Ex. 1 at GPLV00000761.)

67.     By contrast, the Consulting Agreement merely required the Otoe-Missouria Tribe to "hire at least one (1) dedicated employee to work with" Think Finance on matters relating to "operational and marketing functions." (Ex. 1 at GPLV00000761.)

**F.    Curry's personal involvement in the enterprise.**

68.     During the pertinent times, Curry was a directors, officer, and owner of Sentinel Resources, and he dominated and controlled its business and operations.

69.     At all times relevant, Curry directed, controlled, and had managerial responsibility for the activities of Sentinel Resources, including its responsibilities under the Consulting Agreement.

70.     At all times relevant hereto, Curry personally participated and operated Sentinel Resources, including carrying out the tasks designated to it under the Consulting Agreement with Think Finance.

71.     Upon information and belief, Curry attended weekly conference calls with representatives of Think Finance during which they reviewed and approved key business decisions of Great Plains, including decisions related to the origination, marketing, underwriting, servicing, and collection of the loans.

72.     According to records from the Division of Corporations from the state of Delaware, Sentinel Resources was formed on January 26, 2011, *i.e.*, shortly after Think Finance made its initial presentation to the Otoe-Missouria Tribe, which was facilitated by Curry.

73.     Thus, Curry formed Sentinel Resources specifically to perpetrate the nationwide scheme to collect usurious loans under the guise of Great Plains and to engage in the unfair and deceptive acts that harmed Plaintiffs.

**G.     Defendants received unlawful interest and principal on the void loans.**

74.     Defendants, together with other members of the enterprise, implemented the plan to originate, market, service, and collect the usurious loans from Florida consumers.

75.     Each of Plaintiffs' loan agreements included unenforceable choice of law and arbitration provisions, which, *inter alia*, prospectively waive the application of all federal and state laws. By extension, the delegation clause in the arbitration provision in each of Plaintiffs' lending agreements is also unenforceable because it, *inter alia*, precludes the arbitrator from applying applicable federal and state laws. The inclusion of these unenforceable provisions in Plaintiffs' loan agreements was an intentional attempt by Defendants and their co-conspirators to insulate themselves from liability for what they knew were unlawful and usurious loans.

76.     The loans Plaintiffs obtained that were originated in the name of Great Plains, for example, carried criminally usurious interest rates under Florida law ranging from 154% to 348%.

77.     Under Florida law, a person or business must have a license from the Florida Financial Services Commission to extend a consumer finance loan, which is defined as a loan of less than $25,000 with an interest rate exceeding 18%. FLA. STAT. § 516.01(2), 516.02(2)(a).

78.     Neither Great Plains, nor any of the other participants in the enterprise had a consumer finance license when the loans were made to Plaintiffs; nor did they ever attempt to obtain such a license.

79.     Consequently, the maximum rate of interest that could be charged on Great Plains loans taken out by Plaintiffs and the Florida class under Florida law was 18%. FLA. STAT. § 516.02(2).

80.     Yet, all of the loans made to Florida consumers in the name of Great Plains used an interest rate greater than 18%.

81.     Specifically, McNeil's loan carried an interest rate of 349.05%—over 19 times the 18% interest cap in Florida for unlicensed loan companies. *See* FLA. STAT. § 516.01(2), 516.02(2)(a).

82.     Similarly, Burney's loans carried interest rates of, *inter alia*, 154.59%, 249.30%, and 348.52%—over eight to nineteen times the 18% interest cap in Florida for unlicensed loan companies. *See id*.

83.     Even with a license, a lender may not charge interest exceeding 30% on the first $3,000 of the principal amount, 24% on the part of the principal amount exceeding $3,000 and up to $4,000, and 18% on that part of the principal amount exceeding $4,000 and up to $25,000. Fla. Stat. § 516.031(1).

84.     Consequently, even if Defendants or any of their co-conspirators in the enterprise had possessed the requisite license, all of the loans made to Florida consumers in the name of Great Plains used an interest rate greater than the maximum allowable rates for small consumer loans by licensed lenders.

85.     If a lender (licensed or unlicensed) charges interest greater than legally permitted, the loan is void and unenforceable. FLA. STAT. § 516.02(2)(c).

86.     Further, under Florida law, it is a criminal offense to make usurious loans at rates of 25% of higher. FLA. STAT. § 687.071. Loan contracts in excess of the 25% threshold triggering criminal liability for usury are similarly "void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935).

87.     FLA. STAT. § 687.04 entitles individuals to whom usurious interest has been charged to damages in the amount of twice the usurious interest that was paid.

88.     FLA. STAT. § 687.147 further provides that individuals to whom usurious interest has been charged shall be entitled to no less than "the amount paid by the borrower to the loan broker, plus reasonable attorneys' fees and costs," as well as punitive damages.

89.     Accordingly, Plaintiffs' loans were null and void, and it was unlawful for Defendants or any of their affiliated entities to collect or receive any principal, interest, or charges on the loans, including the amounts paid by Plaintiffs.

90.     Defendants and their co-conspirators received no less than $18,612 from Burney and no less than $2,867 from McNeil arising from their illegal loans with Great Plains.

91.     This conduct not only violated Florida's usury laws, but it also constitutes unfair and deceptive business practices under the FDUPTA. At all times relevant to this lawsuit, Defendants were engaged in the trade or practice of loaning money to consumers like Plaintiffs.

92.     Defendants used Great Plains as a front for their illegal operations, with the hope that presenting Great Plains as the lender would keep consumers from learning the true nature of the business.

93.     Defendants falsely represented to Plaintiffs and other Florida consumers that their loans were from an entity that was not actually the lender, their debts were valid and enforceable, not governed by Federal or State law, and any disputes were subject to arbitration that would not apply Federal or State law, none of which were true.

94.     As a result of Defendants' unfair and deceptive conduct, Plaintiffs and Florida consumers paid back far more on their loans than they actually borrowed, none of which was validly due under Florida law.

95.     Defendants' conduct also violated § 1962(c) of RICO, which prohibits the "collection of unlawful debt." 18 U.S.C. § 1962(c).

96.     RICO defines "unlawful debt" as a debt that was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

97.     Plaintiffs were charged an interest rate far in excess of the enforceable rate established by Florida law, and, thus, Defendants violated RICO's prohibition against the collection of unlawful debt.

98.     As a result of Defendants' participation in the Enterprise and violations of RICO, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT ONE:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

99.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

100.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as:

> All Florida consumers who executed a loan with Great Plains where any amount on the loan was repaid.

101.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief and as reflected by the profits generated by Defendants, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Think Finance and GPLS, and the class members may be notified of the pendency of this action by published and/or mailed notice.

102.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether an enterprise existed; (2) whether Defendants participated in the affairs of the enterprise; (3) whether the loans are "unlawful debt" for purposes of RICO; and (4) what is the proper recovery for Plaintiffs and the class members against Defendants for their role in the enterprise.

103.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

104.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

105.   **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

106.   **Injunctive Relief Appropriate for the Class. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to divest themselves of any interest in any enterprise pled herein, including the receipt of any proceeds

arising from the unlawful collection of debt and prohibiting Defendants from continuing to engage in any enterprise pled herein or selling the outstanding balances on the loans to any third parties.

107.    As alleged above, Defendants, along with other participants in the enterprise, violated § 1962(c) of RICO through the "collection of unlawful debt." 18 U.S.C. § 1962(c).

108.    RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

109.    All of the loans made to Florida residents included an interest rate far in excess of twice the enforceable rate in Florida.

110.    This conduct began sometime as early as 2011, continues to date, and will be repeated again and again in the future to the detriment of Florida consumers.

111.    Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c) and are entitled to treble their actual damages, which would include any interest, fees, or other sums Defendants acquired through their participation in the enterprise.

## COUNT TWO:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

112.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

113.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as:

> All Florida consumers who executed a loan with Great Plains where any amount on the loan was repaid.

114.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief and as reflected by the profits generated by Defendants, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable

through the internal business records maintained by Think Finance and GPLS, and the class members may be notified of the pendency of this action by published and/or mailed notice.

115.   **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).**
Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether an enterprise existed; (2) whether Defendants agreed to the conspiracy to violate RICO; (3) whether the loans are "unlawful debt" for purposes of RICO; and (4) what is the proper recovery for Plaintiffss and the class members against Defendants for their role in the enterprise.

116.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

117.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

118.   **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The

damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

119.   **Injunctive Relief Appropriate for the Class.**   **Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to divest themselves of any interest in any enterprise pled herein, including the receipt of any proceeds arising from the unlawful collection of debt and prohibiting Defendants from continuing to engage in any enterprise pled herein or selling the outstanding balances on the loans to any third parties.

120.   As alleged above, Defendants violated § 1962(d) of RICO by agreeing to facilitate the collection of unlawful debt. Their agreement to engage in the conspiracy is evidenced, *inter alia*, by the series of agreements to facilitate the enterprise, including the Consulting Agreement dated May 25, 2011 and their participation in the January and February 2011 meetings.

121.   As a result of Defendants' participation in the enterprise and violations of RICO, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

122.     Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by Defendants.

**COUNT THREE:**
**VIOLATIONS OF FLORIDA CONSUMER FINANCE LAWS**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

123.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

124.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as follows:

> **Florida Usury Class**: All Florida consumers who made a payment on any loan with Great Plains.

Plaintiffs are members of the Florida Usury Class.

125.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Think Finance and GPLS, and the class members may be notified of the pendency of this action by published and/or mailed notice.

126.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the loans made to Florida consumers charged interest in excess of that permitted by Florida law; (2) whether Plaintiffs may recover from Defendants the amounts paid on the loans; and (3) what is the proper recovery for Plaintiffs and the class members against each Defendant.

127.   **Typicality**. **Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

128.   **Adequacy of Representation**. **Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

129.   **Superiority**. **Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

130.    All of the loans made to Florida consumers in the name of Great Plains contained interest rates greater than 18%.

131.    As explained above, Defendants each received revenues collected on the loans.

132.    Plaintiffs paid interest in excess of that permitted by Florida law.

133.    Accordingly, Plaintiffs and the class members are entitled to recover all amounts repaid on the void loans, plus twice the amount of usurious interest that was paid, as well as attorneys' fees and costs. FLA. STAT. §§ 516.02, 687.04.

**COUNT FOUR:**
**UNJUST ENRICHMENT**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

134.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

135.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Florida Unjust Enrichment Class"—initially defined as follows:

> **Florida Unjust Enrichment Class**: All Florida residents who executed a loan with Great Plains where any amount of principal, interest, fees, or other charges were repaid.

Plaintiffs are members of the unjust enrichment class.

136.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from Florida consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Think Finance and GPLS, and the class members may be notified of the pendency of this action by published and/or mailed notice.

137.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no

factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Plaintiffs and the class members conferred a benefit on Defendants; (2) whether Defendants knew or should have known of the benefit; (3) whether Defendants retained an unjust benefit because the loans were void; and (4) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

138. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

139. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

140. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized

litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

141.    All of the loans to Florida consumers in the name of Great Plains were void and unenforceable.

142.    Plaintiffs conferred a benefit on Defendants when they repaid the void loans; Defendants knew or should have known of the benefit; and Defendants have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

143.    Accordingly, on behalf of themselves and all other Florida consumers similarly situated, Plaintiffs seek to recover from Defendants, jointly and severally, all amounts repaid on any loans with Great Plains.

**COUNT FIVE:**
**VIOLATIONS OF FLORIDA UNFAIR & DECEPTIVE TRADE PRACTICES ACT**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

144.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

145.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as follows:

> **Florida FDUTPA Class**: All Florida consumers who executed a loan agreement with Great Plains.

Plaintiffs are members of the Florida FDUTPA Class.

146.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Think Finance and

GPLS, and the class members may be notified of the pendency of this action by published and/or mailed notice.

147. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the loans made to Florida consumers charged interest in excess of that permitted by Florida law; (2) whether Defendants' practices in marketing the loans to Florida consumers was deceptive and unfair; and (3) what is the proper recovery for Plaintiffs and the class members against each Defendant.

148. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

149. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their Counsel have any interests that might cause them to not vigorously pursue this action.

150. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The

damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

151.    All of the loans made to Florida consumers in the name of Great Plains contained interest rates greater than 18%. Defendants marketed the loans using the identical representations to all Florida consumers, and executed the same paperwork in memorializing the loans to Florida consumers.

152.    As explained above, Defendants each received revenues collected on the loans and engaged in deceptive conduct in marketing and creating the loans.

153.    Plaintiffs paid interest in excess of that permitted by Florida law.

Accordingly, Plaintiffs and the class members are entitled to recover actual damages from the usurious loans, their attorneys' fees and costs, and injunctive relief as allowed by the FDUTPA. Fla. Stat. §§ 501.204, 501.2105, 501.211.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs request that the Court enter judgment on behalf of themselves and the class they seek to represent against Defendants for:

A.    Certification for this matter to proceed as a class action;

B.    Declaratory, injunctive, and actual and punitive damages relief as pled herein;

C.     Attorney's fees, litigation expenses, and costs of suit; and

D.     Such other or further relief as the Court deems proper.

**TRIAL BY JURY IS DEMANDED**

Respectfully submitted,
**PLAINTIFFS**

By:     */s/ Craig C. Marchiando*
Craig C. Marchiando, Fla. Bar No. 1010769
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA  23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: craig@clalegal.com

Anna Haac (*pro hac vice* to be filed)
Andrew Silver (*pro hac vice* to be filed)
**TYCKO & ZAVAREEI, LLP**
1828 L Street, N.W., Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
*asilver@tzlegal.com*
*ahaac@tzlegal.com*

*Counsel for Plaintiffs and the Proposed Classes*